**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 8, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CGC HOLDING COMPANY, LLC, a
Colorado limited liability company;
CRESCENT SOUND YACHT CLUB,
LLC, a Florida limited liability
company; HARLEM ALGONQUIN
LLC, an Illinois limited liability
company; and JAMES T. MEDICK, on
behalf of themselves and all others
similarly situated,

        Plaintiffs-Appellees,

v.

BROAD AND CASSEL, a Florida
general partnership; RONALD
GACHÉ; and CARL ROMANO,

        Defendants-Appellants.

No. 13-1255

_____

CGC HOLDING COMPANY, LLC, a
Colorado limited liability company;
CRESCENT SOUND YACHT CLUB,
LLC, a Florida limited liability
company; HARLEM ALGONQUIN
LLC, an Illinois limited liability
company; and JAMES T. MEDICK, on
behalf of themselves and all others
similarly situated,

        Plaintiffs-Appellees,

v.

No. 13-1257

SANDY HUTCHENS, also known as Fred Hayes, also known as Moishe Alexander, also known as Moshe Ben Avraham; TANYA HUTCHENS; JENNIFER HUTCHENS, also known as Jennifer Araujo; H. JAN LUISTERMANS, also known as Herman Luisterman; 1681071 ONTARIO INC., an Ontario corporation which has changed its name to Canadian Funding Limited; NORTHERN CAPITAL INVESTMENTS LTD, an Ontario corporation; 2800 NORTH FLAGLER DRIVE UNITS 106-107 LLC, a Florida limited liability company; ESTATE OF JUDITH HUTCHENS; 129 LAREN STREET INC., an Ontario corporation, also known as 2141250 Ontario Inc.; 3415 ERRINGTON AVENUE INC., an Ontario corporation, also known as 2129974 Ontario Inc.; 367-369 HOWEY DRIVE INC., an Ontario corporation, also known as 1714530 Ontario Inc.; 3419 ERRINGTON AVENUE INC., an Ontario corporation, also known as 2129982 Ontario Inc.; 17 SERPENTINE STREET INC., an Ontario corporation, also known as 1714529 Ontario Inc.; 720 CAMBRIAN HEIGHTS INC., an Ontario corporation, also known as 2154461 Ontario Inc.; 331 REGENT STREET INC., an Ontario corporation, also known as 2126929 Ontario Inc.; 789 LAWSON STREET INC., an Ontario corporation, also known as 2128417 Ontario Inc.; 110-114 PINE STREET INC., an Ontario corporation, also known as 2173061 Ontario Inc.;

-2-

15-16 KEZIAH COURT INC., an Ontario corporation, also known as 2128412 Ontario Inc.; 193 MOUNTAIN STREET INC., an Ontario corporation, also known as 2141249 Ontario Inc.; 625 ASH STREET INC., an Ontario corporation, also known as 2128413 Ontario Inc.; 364 MORRIS STREET INC., an Ontario corporation, also known as 2119821 Ontario Inc.; SANTAN PROPERTY MANAGEMENT INC.; 101 SERVICES ROAD INC.; 146 WHITAKER STREET INC., an Ontario corporation; JBD HUTCHENS FAMILY HOLDINGS INC., an Ontario corporation, also known as 2129981 Ontario Inc.; JBD HOLDINGS; 1697030 ONTARIO INC.,

          Defendants-Appellants,

and

308 ELGIN STREET INC.; 1539006 ONTARIO INC.; FIRST CENTRAL HOLDINGS INC.; FIRST CENTRAL MORTGAGE FUNDING INC.; CANADIAN FUNDING CORPORATION; REALTY 1 REAL ESTATE SERVICES LTD.,

          Defendants.

-3-

_____

CGC HOLDING COMPANY, LLC, a
Colorado limited liability company;
CRESCENT SOUND YACHT CLUB,
LLC, a Florida limited liability
company; HARLEM ALGONQUIN
LLC, an Illinois limited liability
company; and JAMES T. MEDICK, on
behalf of the themselves and all others
similarly situated,

        Plaintiffs-Appellees,

v.                            No. 13-1258

ALVIN MEISELS,

        Defendant-Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 11-cv-01012-RBJ-KLM)**

---

James D. Kilroy (Jessica E. Yates with him on the briefs), Snell & Wilmer L.L.P., Denver, Colorado, for Case No. 13-1255 Appellants.

Steven A. Klenda, Adroit Advocates, LLC, Denver, Colorado, for Case No. 13-1257 Appellants.

John M. Palmeri (Heather K. Kelly and Greg S. Hearing with him on the briefs), Gordon & Rees LLP, Denver, Colorado, for Case No. 13-1258 Appellants.

John F. Head, Head & Associates, P.C., Denver, Colorado, for Appellees.

---

Before, **KELLY**[*], **TYMKOVICH** and **PHILLIPS**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

This case requires us to consider the certification of a proposed class action to pursue claims under the Racketeer Influenced and Corrupt Organizations Act (RICO). A class primarily composed of real estate borrowers sued a group of lenders, claiming the lenders conspired to create a fraudulent scheme to obtain non-refundable up-front fees in return for loan commitments the lenders never intended to fulfill.

On behalf of the proposed class, the class representatives—Colorado Golf Club Holding Company LLC (CGC Holding), Harlem Algonquin LLC and James T. Medick[1]—allege that the lenders misrepresented their ability and their objective to make good on the promises to meet certain financing obligations as part of a scheme to entice borrowers to pay the up-front fees. In addition, the class intends to offer generalized proof that the lenders concealed the financial

_____

[*] The late Honorable William J. Holloway, United States Senior Circuit Judge, heard oral argument in this appeal. However, he passed away before the opinion in this case was finalized, and he cast no vote with respect to this finalized opinion. The Honorable Paul J. Kelly, Jr. substitutes to vote on this final opinion.

[1] Throughout the opinion, we also refer to the class representatives simply as "plaintiffs" or "borrowers."

history of Sandy Hutchens, the principal defendant, and his use of pseudonyms, to preserve the superficial integrity of the operation. Had they known about this pretense, say the borrowers, no putative class member would have taken part in the financial transactions that caused each to lose its up-front fees, amounting to millions of dollars of cumulative losses.

The lenders oppose class certification under Rule 23 of the Federal Rules of Civil Procedure. They contend class action is an inappropriate litigation vehicle because the borrowers are unable to demonstrate that common issues susceptible to generalized proof will predominate over any issues affecting class members individually. In particular, the lenders contend that each class member will have to demonstrate that it relied on the lenders' misrepresentations or omissions to satisfy RICO's causation element, making a single trial unwieldy and unworkable.

The lenders are wrong, but not because plaintiffs benefit from a legal "presumption" of reliance as identified by the district court. As we explain, RICO class-action plaintiffs are not entitled to an evidentiary presumption of a factual element of a claim. But still we agree with the district court that a class can be certified in this context. The plaintiffs' theory of the case rests on a straightforward premise—that no rational economic actor would enter into a loan commitment agreement with a party they knew could not or would not fund the loans. Accordingly, plaintiffs' payment of up-front fees allows for a reasonable inference that the class members relied on lenders' promises, which later turned

out to be misrepresentations or omissions of financial wherewithal. This theory sufficiently allays concerns about Rule 23(b)(3)'s requirement that common issues predominate over those idiosyncratic to individual class members.

And with the predominance requirement met, the borrowers have sufficiently proved each of the elements required to certify a class under Rule 23. For this reason, the district court thus did not err in certifying the class. The defendants associated with the lenders' law firm, however, are an exception. For that subset of the defendants, we reverse because plaintiffs concede that they lack standing to pursue claims involving the law firm.

Exercising jurisdiction under Rule 23(f), we AFFIRM the class certification decision on modified grounds. We also REVERSE the district court's class certification decision as to the lenders' law firm and lawyers, Broad and Cassel, Ronald Gaché and Carl Romano, and REMAND with instructions to DISMISS the claims against those defendants.

Finally, because several claims are not properly before us in this interlocutory appeal, we decline to address (1) whether plaintiffs' claims constitute an impermissible extraterritorial application of RICO, (2) whether the plaintiffs can prove proximate cause, or (3) whether the district court properly exercised personal jurisdiction over certain defendants.

# I. Background

## A. Hutchens and the Alleged Fraud

We take the facts as alleged in the complaint. The complaint alleges that Sandy Hutchens was the mastermind behind the loan commitment fraud at the heart of this case. Plaintiffs contend Hutchens is a career criminal with a history of schemes similar to the one at issue here. In 2004, Hutchens pleaded guilty to financial fraud charges in Canada and was sentenced to two years of house arrest followed by two years of probation.[2] For reasons that become relevant later, after his Canadian conviction, Hutchens converted to orthodox Judaism and changed his name to Moishe Alexander Ben Avraham. In addition to the moniker Moishe Alexander, Hutchens maintained several other aliases to conceal his identity, including Moishe Alexander ben Avrohom, Moshe Ben Avraham, Fred Hayes, Alexander MacDonald, Matthew Kovce, and Frederick Merchant.[3] Not surprisingly, Hutchens disagrees with the plaintiffs' characterization of his operation and contends that he was a legitimate financial investor and lender with success closing mortgage transactions, asset purchases, and other investments.

---

[2] The amended complaint contains numerous allegations regarding Hutchens's past. For example, plaintiffs allege that Hutchens misrepresented joint venture relationships with prominent North American lenders and invented certain offshore funding sources. Furthermore, the record reflects that Hutchens's history of malfeasance was chronicled in several newspaper articles and on various internet websites.

[3] For consistency, we refer to Sandy Hutchens as "Hutchens" throughout the opinion, even though he went by different names during his interactions with the putative class members.

Plaintiffs' central claim is that Hutchens and his associates engaged in a common scheme to defraud distressed, do-or-die borrowers out of up-front payments. The formula for Hutchens's alleged cookie-cutter scheme is not complicated. First, a potential borrower would submit a loan application to one of several issuing entities through a loan broker. Typically, the applicant would identify in its application a piece of real estate that could serve as collateral to secure the loan. After receiving the application, an issuing entity would extend the applicant a loan commitment agreement. Under its terms, the applicant was required to pay, among other advanced fees, an up-front, non-refundable payment known as a "loan commitment fee." In addition to this up-front fee, as a strict condition of the terms of the agreement, the applicant was also required to meet certain eligibility requirements prior to receiving the loan. One of these conditions set a minimum valuation for the collateral property. If an appraisal valued the property below the amount necessary to secure the loan, then the commitment agreement would be annulled. Another condition required that the applicant timely submit necessary paperwork to facilitate the loan's approval. At some point in the process, the issuing entities terminated each of the borrowers' loan commitment agreements for failing, in one form or another, to comply with the conditions of the agreement.

Plaintiffs claim this scheme was subterfuge for a scam to appropriate the up-front fees without any intent or ability to ultimately fund the committed loan.

To this end, Hutchens and his cohorts would fabricate a reason to deny the loan or otherwise blame the borrower for the deal's dissolution. According to Hutchens's former accountant, Martin Lapedus, by the end of 2009 the issuing entities controlled by Hutchens had received over $8 million in up-front fees from applicants, but had lent less than $500,000 in total funding. Furthermore, Lapedus alleges that the issuing entities, and by extension Hutchens, never had the liquidity to close the substantial loans committed to in the loan agreements.

Plaintiffs also allege that Hutchens and his syndicate concealed several material aspects of Hutchens's criminal or otherwise problematic past, including his use of aliases to perpetuate false perceptions and obscure his identity. In the same vein, plaintiffs allege that the physical addresses associated with the issuing entities were façades used to shield the illusory nature of Hutchens's business. At bottom, plaintiffs contend that this deceit amounted to an effort to beguile class members, ignorant of Hutchens's unsavory methods, to enter the loan commitment agreements. But for these active omissions and misrepresentations, say plaintiffs, no putative class member would have participated in the deals.

## B. Other Defendants

Plaintiffs also claim a number of other individuals and entities conspired with Hutchens.

### 1. The Hutchens Family and Related Entities

First, plaintiffs allege Hutchens's wife, Tanya, and his daughter, Jennifer, are co-conspirators. They claim Tanya Hutchens as the person responsible for operating and maintaining the books of the fraudulent enterprise. She also controlled the majority of the entities to which the enterprise funneled the ill-gotten gains of their alleged scheme. Jennifer Hutchens (or Jennifer Araujo) was the "Manager of Underwriting" for several of the corporate entities.

Plaintiffs next contend H. Jan Luistermans is a Canadian real estate agent who worked with the Hutchens's enterprise. His primary responsibility was inspecting potential borrowers' properties to determine whether the property could serve as acceptable collateral for the loans. During the relevant time period, Luistermans was employed by Realty 1 Real Estate Services Ltd.

Additionally, the complaint named five issuing entities as defendants. The issuing entities—308 Elgin Street Inc. (308 Elgin), Canadian Funding Corporation (CFC), First Central Mortgage Funding Inc. (FCMF), Northern Capital Investment Ltd. (NCI), and Great Eastern Investment Fund, LLC (GEIF)—are all Canadian corporations that allegedly served as vehicles to issue the conditional loan commitments and accept the up-front fees required to secure those commitments. A sixth entity, First Central Holdings Inc. (FCH), served a similar function, allegedly receiving payments via wire transfers from class members. Finally, Hutchens and his associates used another cadre of entities, collectively referred to here as the transferees, to funnel or transfer class members' advance payments.

-11-

The transferees would allegedly purchase real estate with these illicit fees soon after receipt.

### 2. *Meisels*

Alvin Meisels's relationship with Sandy Hutchens dates back to at least 2004 when Meisels represented Hutchens in connection with criminal charges for fraud. Meisels is an Ontario, Canada lawyer alleged to have advised Hutchens throughout the period relevant to this action. Plaintiffs contend that Meisels frequently certified the legitimacy of Hutchens's ability to fund loan commitments. According to the complaint, Meisels was on notice about Hutchens's criminal history from the outset of their relationship.

Meisels also represented Hutchens in a 2006 lawsuit alleging that Hutchens committed a similar advance-fee loan fraud. Meisels subsequently served as counsel to Hutchens in an action to secure an injunction against Brent Hillyer, who was allegedly the source of several defamatory internet postings about Hutchens. All told, from 2004 until March 2010, Meisels provided legal representation to Hutchens and various other defendants.

Plaintiffs specifically allege that Meisels vouched for the bona fides of several defendant entities on $420 million worth of loan commitments to borrowers based out of Florida. Meisels also served as a reference for Hutchens and frequently disseminated positive information while withholding facts that tended to show Hutchens's criminal past or other sordid factors.

### *3. The Broad Defendants*

Broad and Cassel is a law firm doing business in Florida. Ronald Gaché and Carl Romano were partners at the firm during the relevant time period.[4] As alleged in the amended complaint, Broad represented several defendants at certain points during 2008. While Broad was counsel to the Hutchens-related entities, it was involved with loan commitments to seventeen prospective borrowers, only five of which paid advanced fees.

### *C. The Putative Class*

Plaintiffs allege that the lenders issued at least 134 loan commitments through the issuing entities over the course of nearly nine years. The putative class, according to plaintiffs, thus includes at least 100 borrowers—consisting of both individuals and corporate entities spanning across fifteen different states—who paid advance fees to defendants. The contracted value of each class member's loan commitment ranged from $500,000 to $80 million. Based on plaintiffs' estimates, the lenders committed to fund at least $760 million in loans, but only closed on one loan for a Florida condominium worth $265,000. The circumstances of the three entities currently serving as the class representatives for the putative class are typical of those of other potential class members.

### *1. CGC Holding*

---

[4] We refer to Broad and Cassel, Gaché, and Romano collectively as "Broad."

CGC Holding is a Colorado limited liability company, which developed an eighteen-hole golf course and related community facilities during 2009. After losing one of its primary investors, CGC Holding sought funding from FCMF and FCH. CGC Holding signed a commitment letter with FCMF pursuant to which FCMF agreed to lend $34 million to CGC Holding subject to certain terms. To comply with the terms, CGC Holding paid FCH at least $182,500 in inspection fees, administrative fees, and legal fees. CGC Holding did not receive the loan. The lenders maintain that CGC Holding's loan commitment was contingent upon its collateral property commanding a valuation of $43 million, of which it fell short.

### 2. *Harlem Algonquin*

Harlem Algonquin was a special-purpose entity operating out of Illinois that was created to purchase and develop a commercial property. A mortgage broker introduced Harlem Algonquin to CFC, and CFC ultimately issued a loan commitment for $3.57 million to facilitate the purchase in June 2010. The parties continued to negotiate, and Harlem Algonquin eventually paid $42,688 in fees to CFC. According to the defendants, Harlem Algonquin failed to supply or untimely delivered the necessary paperwork to complete its application. For this reason, Harlem Algonquin never received a loan from the lenders. Harlem Algonquin has since been involuntarily dissolved by the state of Illinois.

### 3. *Medick*

James T. Medick wanted to purchase his former home in San Clemente, California from his ex-wife. For this purpose, Medick was put in touch with FCMF, which eventually committed to loan Medick $4 million. To secure the necessary funding, he paid $95,950 to FCH in three payments during the first three months of 2010. The terms of his commitment contract required that the existing mortgages and encumbrances on the former home be up to date. Since two mortgages and property taxes on the home were in arrears, CFC terminated his application.

### D. Procedural History

The defendants filed numerous procedural and substantive motions, which the district court mostly denied in 2011. The court subsequently certified a class including persons and entities fitting the following definition:

> All U.S. residents or domiciled entities (1) who were issued loan commitments between January 1, 2005, and April 7, 2013, (2) by Canadian Funding Corporation, First Central Mortgage Funding, Inc., 308 Elgin Street Inc., Northern Capital Investment Ltd., Great Eastern Investments, LLC, or any other entity controlled by Sandy Hutchens, (3) whose loan commitments were not funded (4) but who paid money to any defendant (5) without having been informed that Moishe Alexander, Moshe Ben Avraham, Fred Haynes, Alexander MacDonald, Mathew Kovce, Fred Merchant, or other aliases, as the case might be, were names used by Sandy Hutchens, and that that individual had a criminal history including a conviction for fraud.

*CGC Holding Co., LLC v. Hutchens*, No. 11-CV-01012-RBJ-KLM, 2013 WL 798242, at \*13 (D. Colo. Mar. 4, 2013).

Pursuant to the interlocutory appeal right of Rule 23(f), the defendants argue the district court erred in finding that questions common to the entire class will predominate over questions unique to individual class members.

## II. Analysis

The scope of our review under Rule 23(f) is limited to whether the district court abused its discretion in its certification of the putative class. As we explain, the district court did not err in certifying the class. While the parties have raised a number of other issues unrelated to class certification, we do not reach those as part of this interlocutory appeal.

### A. *Class Certification*

Hutchens and Meisels contend that the district court abused its discretion by certifying the putative class because individual issues will overwhelm the common issues of fact and law, making class treatment unmanageable and inappropriate. They argue that, among other things, the motives, levels of knowledge, diligence, and financial status of each class member are so different that the district court will be inundated with independent inquiries specific to each class member. And they contend that unpacking these unique concerns will dominate the litigation.

"When the district court has applied the proper standard in deciding whether to certify a class, we may reverse that decision only for abuse of discretion." *Adamson v. Bowen*, 855 F.2d 668, 675 (10th Cir. 1988). The district court abuses its discretion when it misapplies the Rule 23 factors—either through a clearly erroneous finding of fact or an erroneous conclusion of law—in deciding whether class certification is appropriate. *Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009); *Shook v. El Paso Cnty.*, 386 F.3d 963, 967–68 (10th Cir. 2004) (*Shook I*). Our review is only de novo to the extent we must determine whether the district court applied the correct standard. *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006). In the end, "[a]s long as the district court applies the proper Rule 23 standard, we will defer to its class certification ruling provided that decision falls within the bounds of rationally available choices given the facts and law involved in the matter at hand." *Vallario*, 554 F.3d at 1264.

### 1. *Class Certification Standards*

When addressing class certification, the district court must undertake a "rigorous analysis" to satisfy itself that the prerequisites of Rule 23 of the Federal Rules of Civil Procedure are met. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (Rule 23(a)); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (Rule 23(b)). Because class action litigation remains "an exception to the usual rule that litigation is conducted by and on behalf of the individual named

parties only," *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979), the requirements of Rule 23 are heavily scrutinized and strictly enforced. "[A]ctual, not presumed, conformance with [Rule 23] remains . . . indispensable." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

Under Rule 23(a), plaintiffs seeking class treatment must establish four threshold requirements:

> (1) the class is so *numerous* that joinder of all members is impracticable;
>
> (2) there are questions of law or fact *common to the class*;
>
> (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and *adequately protect* the interests of the class.

Fed. R. Civ. P. 23(a) (emphasis added). In other words, the class must demonstrate the requisite *numerosity, commonality, typicality, and adequacy* to proceed with a class action.

If the class meets the four criteria under Rule 23(a), then the court must consider whether the class satisfies at least one of the three alternative class-types under Rule 23(b):

First, Rule 23(b)(1) addresses situations where "incompatible standards of conduct for the party opposing the class" would arise without class treatment. *Id.* at (b)(1).

-18-

Second, Rule 23(b)(2) covers class actions for declaratory or injunctive relief where the party defending against the class "has acted or refused to act on grounds that apply generally to the class." *Id.* at (b)(2).

Third, as is the case here, Rule 23(b)(3) is available where "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* at (b)(3). In other words, class status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation.

None of the elements of Rule 23(a) is realistically in dispute in this case.[5] The real question is whether plaintiffs have sufficiently met their burden under Rule 23(b)—specifically whether the plaintiffs can show that common questions subject to generalized, classwide proof *predominate* over individual questions. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622–23 (1997). It is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive. *Amgen Inc.*

_____

[5] Broad disputes whether the putative class is sufficiently numerous as against the law firm defendants. Because we handle Broad separately, *see* Part II.C.3 *infra*, we need not address numerosity at this juncture.

*v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013). Put differently, the predominance prong "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." 2 William B. Rubenstein et al., *Newberg on Class Actions* § 4:49, at 195–96 (5th ed. 2012) ("*Newberg*").

Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. *Id.* § 4:50, at 196. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013) (finding that the district court must consider the particular facts of a case, including the underlying claims, when deciding a motion for class certification); *see also Rutstein v. Avis Rent-A-Car Sys.*, *Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000) ("Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action."). Stated another way, consideration of how the class intends to answer factual and legal questions to

prove its claim—and the extent to which the evidence needed to do so is common or individual—will frequently entail some discussion of the claim itself. *See Falcon*, 457 U.S. at 160.

In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. *See Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982); *see also Amgen Inc.*, 133 S. Ct. at 1195 ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. *See Shook v. Bd. of Cnty Comm'rs of El Paso*, 543 F.3d 597, 612 (10th Cir. 2008) (*Shook II*); *Vallario*, 554 F.3d at 1266. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.12 (1978); *see also Shook II*, 543 F.3d at 612 ("[W]hile a district court may not evaluate the strength of a cause of action at the class certification stage, it must consider, without passing judgment on whether plaintiffs will prevail on the

merits, whether remedying the harm alleged can be done on a class-wide basis in conformity with Rule [23].").

With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (quoting Rule 23). For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

### 2. *Civil RICO*

The Racketeer Influenced and Corrupt Organizations Act (RICO) establishes a civil cause of action for persons injured as a result of a prohibited racketeering activity. 18 U.S.C. § 1962(c); *see also Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010). To prove a RICO violation, a plaintiff must show that the defendant violated the RICO statute, and the plaintiff was injured "by reason of" that violation. 18 U.S.C. §§ 1962, 1964(c). A defendant violates the act when he (1) participates in the conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. *See Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006). Section 1961(1)(B) describes the qualifying "racketeering activities," or "predicate acts," which include wire fraud. *Id.* at § 1961(1)(B). Pursuant to § 1962(d), conspiracy to commit a RICO violation also constitutes a violation of the Act when a conspirator adopts the goal of furthering the enterprise, even if the

conspirator does not commit a predicate act. *United States v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011).

Under RICO's "by reason of" requirement, "to state a claim . . . the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). Sufficiently establishing the element of causation—both actual and proximate—is crucial to proving any violation of RICO. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656–60 (2008). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Tailored to the predominance inquiry, the question is whether the link between defendants' actions and the class's injuries can be adduced through common evidence.

Although reliance is not an explicit element of a civil RICO claim, it frequently serves as a proxy for both legal and factual causation. *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008), *abrogated on other grounds by Bridge*, 553 U.S. 639. But despite its usefulness as a stand-in for causation, strict first-party reliance is not a prerequisite to establishing a RICO violation. *Bridge*, 553 U.S. 639; *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 420 (6th Cir. 2013) ("For RICO purposes, reliance and proximate cause

remain distinct—if frequently overlapping—concepts. While reliance is often used to prove . . . the element of causation, that does not mean it is the only way to do so." (internal quotations omitted)). Nevertheless, in cases arising from fraud, a plaintiff's ability to show a causal connection between defendants' misrepresentation and his or her injury will be predicated on plaintiff's alleged reliance on that misrepresentation. Put simply, causation is often lacking where plaintiffs cannot prove that they relied on defendants' alleged misconduct. Ultimately, in cases such as this one, "proving reliance is necessary [because] it is integral to Plaintiffs' theory of causation." *Hoffman v. Zenith Ins. Co.*, 487 F. App'x 365, 365 (9th Cir. 2012).

### 3.  *The Predominance Element in RICO Class Actions*

Next, we must determine whether reliance in this case is susceptible to general and classwide proof.

Reliance, as a means of establishing RICO causation and beyond, takes on uncommon gravity when it arises in the context of establishing predominance under Rule 23. In practice, efforts to certify classes based on causes of action that require an element of causation, including RICO, often turn on whether the class can demonstrate that reliance is susceptible to generalized proof. *Compare In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119 (2d Cir. 2013), *cert. denied* 134 S. Ct. 1938 (2014) (certifying RICO class based on a classwide inference of reliance); *Klay v. Humana*, 382 F.3d 1241 (11th Cir. 2004) (same),

-24-

*abrogated on other grounds by Bridge*, 553 U.S. 639; *with Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004) (declining to certify class because individualized issues of reliance would dominate); *Sandwich Chef of Tex., Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 219 (5th Cir. 2003) ("The pervasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification."); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 434 (4th Cir. 2003) (finding reliance not easily proven by common evidence).

The status of reliance as a focal point at the class certification stage is primarily a forward-looking evidentiary concern. Since reliance is often a highly idiosyncratic issue that might require unique evidence from individual plaintiffs, it may present an impediment to the economies of time and scale that encourage class actions as an alternative to traditional litigation. In terms of Rule 23 doctrine, individualized issues of reliance often preclude a finding of predominance.

But that is not always the case. Sometimes issues of reliance can be disposed of on a classwide basis without individualized attention at trial. For example, where circumstantial evidence of reliance can be found through generalized, classwide proof, then common questions will predominate and class treatment is valuable in order to take advantage of the efficiencies essential to class actions. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 119; *Klay*,

382 F.3d at 1258–59.  Under certain circumstances, therefore, it is beneficial to permit a commonsense inference of reliance applicable to the entire class to answer a predominating question as required by Rule 23.  In the RICO context, class certification is proper when "causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct."  *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 603 (S.D. Cal. 2011).

Cases involving financial transactions, such as this one, are the paradigmatic examples of how the inference operates as an evidentiary matter.  On this point, the Second Circuit's recent decision in *In re U.S. Foodservice Inc. Pricing Litigation* is instructive.  729 F.3d 108.  In that case, defendants challenged the certification of a nationwide RICO class action against a food distributor for fraudulent overbilling under a "cost-plus" payment plan.  Defendants appealed the district court's class certification decision on several grounds, including that the district court ignored particularized issues of reliance that were bound to predominate.  *See id.* at 119.  The Second Circuit disagreed, finding circumstantial proof of classwide reliance in the fact that class members made payments pursuant to the agreements:

> In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount

> specified in an inflated invoice would not have done so absent reliance on the invoice's implicit representation that the invoiced amount was honestly owed. Fraud claims of this type may thus be appropriate candidates for class certification because "while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)."

*Id.* at 120 (quoting *Klay*, 382 F.3d at 1258).

Likewise, the Eleventh Circuit in *Klay v. Humana* found that an inference of reliance was appropriate where "circumstantial evidence that can be used to show reliance is common to the whole class. That is, the same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations." *Klay*, 382 F.3d at 1259. *Klay* involved class claims brought by doctors against health maintenance organizations (HMOs), alleging a conspiracy to systematically underpay physicians on reimbursements for their services. *Id.* at 1246. To rebut the HMOs' claims that this inference was inappropriate, the court commented that "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due." *Id.* at 1259.

*In re U.S. Foodservice Inc. Pricing Litigation* and *Klay* are persuasive and they are hardly alone in reasoning that circumstantial evidence of reliance is sufficient to allege RICO causation for purposes of Rule 23. Indeed, numerous

district court decisions, in the process of certifying classes, have accentuated facts similar to those in this case—primarily, the alleged legitimacy of the counterparty to an agreement,[6] or the fact that all plaintiffs paid fees in exchange for a promise[7]—as proper grounds to infer reliance on a classwide basis.[8] Moreover,

---

[6] *See Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 546 (D. Md. 2011) ("[T]he common inference involved in most such cases, as well as in the case at bar, is that members of the plaintiff class relied upon the purported legitimacy of the defendant with which they transacted."); *Robinson v. Fountainhead Title Grp. Corp.*, 257 F.R.D. 92, 95 (D. Md. 2009) ("[I]t would be a reasonable inference to assume that a class member who purchased services from Assurance Title relied on the legitimacy of that organization in paying the rate charged.").

[7] *See Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 348 (S.D. Iowa 2013) ("[T]he civil RICO claim's reliance element may be established by circumstantial evidence applicable to the class as a whole—the payment of the amounts shown in class members' mortgage statements, which amounts included property inspection fees."); *Kennedy v. Jackson Nat'l Life Ins. Co.*, No. C 07-0371CW, 2010 WL 2524360, at *8 (N.D. Cal. June 23, 2010) (finding that an inference of reliance can arise where class members would not have purchased the product had they been fully informed of the facts); *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 235 (E.D. Pa. 1999) ("It need not involve time consuming proof of individual causation or reliance. If the plaintiffs can prove that UDS was a complete sham, then a fact finder can infer from the evidence that anyone who paid tuition and attended the school suffered damage."); *Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84–85 (N.D. Ill. 1997) ("It is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable.").

[8] Still other cases have generally supported the application of this inference under the right circumstances. *See McLaughlin*, 522 F.3d at 225 (stating that "proof of reliance by circumstantial evidence may be sufficient under certain conditions"); *Jenson v. Fiserv Trust Co.*, 256 F. App'x 924, 926 (9th Cir. 2007) (finding that it was "not unreasonable . . . to infer reliance by all [class]members" when a trust company made similar fraudulent promises about the nature of financial returns in an alleged Ponzi scheme); *Torres v. SGE Mgmt.*

(continued...)

-28-

outside the context of class certification, the inference of reliance has also been deemed appropriate in RICO and similar fraud cases. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 58 (1st Cir. 2013), *cert. denied*, 134 S. Ct. 786 (2013) (granting an inference of reliance in a non-class-action RICO case); *In re Park W. Galleries, Inc., Mktg. & Sales Practices Litig.*, No. 09-2076RSL, 2010 WL 2640256, at *4 (W.D. Wash. June 25, 2010) (same); *Smith v. MCI Telecommunications Corp.*, 124 F.R.D. 665, 679 (D. Kan. 1989) (finding that with respect to a common law fraud claim, "[i]t is implausible that, in initiating or continuing their employment with MCI, the salespersons did not rely on the commissions plans which they were required to sign. Further, whether their reliance was reasonable is an objective inquiry common to the entire proposed class.").

The logic of these cases applies here. Under the facts of this case, evidence of payment for the loan commitment—more specifically, the inference that arises from it—is sufficient to present a predominating question related to class member reliance that can resolve a central issue of this litigation in one swoop. Resorting

---

[8](...continued)
*LLC*, No. 4:09-CV-2056, 2014 WL 129793, at *10 (S.D. Tex. Jan. 13, 2014) ("Because both logical inference and circumstantial evidence allow the class members to establish proximate cause on a classwide basis, the Court finds that common, rather than individual issues, predominate."); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 287 F.R.D. 590, 612 (C.D. Cal. 2012) ("The Court agrees—resort to the 'common sense' inference for proving class-wide reliance remains appropriate in this case.").

to this generalized inference of reliance addresses a critical classwide piece of evidence and will not require individualized consideration that would belie class treatment.[9]  More specifically the fact that a class member paid the nonrefundable up-front fee in exchange for the loan commitment constitutes circumstantial proof of reliance on the misrepresentations and omissions regarding Hutchens's past and the defendant entities' ability or intent to actually fund the promised loan.

Were we deciding the merits of an individual plaintiff's RICO fraud claim, we would surely accept the introduction of such an inference—the factfinder's ultimate acceptance or rejection notwithstanding—with little analysis.  For the purposes of class certification, we see no reason why a putative class containing plaintiffs, who all paid substantial up-front fees in return for financial promises, should not be entitled to posit the same inference to a factfinder on a classwide basis.  When plaintiffs are given the opportunity to present that inference as their theory of causation, reliance, an issue often wrought with individualized inquiries, becomes solvable with a uniform piece of circumstantial evidence. Furthermore, the circumstantial fact of payment of the up-front fee is common to

---

[9]  We note that the inference of reliance here is limited to transactional situations—almost always financial transactions—where it is sensible to assume that rational economic actors would not make a payment unless they assumed that they were receiving some form of the promised benefit in return.  This inference would not be appropriate in most RICO class actions.  And even in financial transaction cases, there may be individual questions, including components of class member reliance, that supplant this inference as the predominating concern for purposes of Rule 23.

the entire class: all class members paid up-front fees without receiving the promised loan. This element is subsumed in the definition of the class itself. And as a result, the putative class is not stymied, for the purposes of class certification, under Rule 23(b)'s predominance element.

The defendants point to cases from other circuits that have resisted class certification in financial transaction cases where reliance cannot be shown through generalized evidence. But those cases, rather than categorically rejecting the inference, simply do not permit its application on a classwide basis due to unique facts surrounding the class claims. In particular, those cases involve significant individualized or idiosyncratic elements that reasonably preclude the predomination of common questions.

For example, *Poulos v. Caesers World, Inc.*, 379 F.3d 654 (9th Cir. 2004), is unpersuasive because the court found that a given putative class member's decision to partake in slot-machine and video-poker gambling was not necessarily done in reliance on the game machine's maker's representations about the odds of winning. Unlike entering into a serious financial transaction, many people gamble without any consideration, let alone reliance, on the representations about the likelihood of striking it rich. Nor does every slot player spend any serious money expecting something (other than a good time, perhaps) in return.

A similar, albeit less direct, conclusion derives from *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*, 319 F.3d 205, 219 (5th

Cir. 2003). In *Sandwich Chef*, the class alleged that several insurance companies defrauded policyholders in violation of RICO by charging excessive premiums on workers' compensation plans.[10] Plaintiffs asserted that their theory of reliance was based on a simple financial transaction; namely, that each class member relied on the accuracy of an inflated invoice when it made payments in satisfaction of their debt. This act of payment, said the class, was sufficient to establish circumstantial evidence of reliance on a classwide basis. The Fifth Circuit disagreed, finding that individualized issues of reliance would take center stage at trial. According to the court, the uniquely negotiated premiums, among other bespoke elements of the insurance policies, would require personalized evidence to establish whether a given plaintiff was aware of the method for calculating premiums, whether individual policyholders were aware that their rates deviated from rates filed with regulators, and, most importantly, whether "a specific policyholder thought an invoice complied with the approved rate and paid an inflated premium in reliance on that belief." *Id.* at 221. Particularly in the context of insurance negotiations, where myriad factors are considered during the fact-specific bargaining process, no set of universal facts could predominate over

---

[10] We also note that *Sandwich Chef*, like *Poulos*, was decided before the Supreme Court's decision in *Bridge*. Accordingly, it focused on the plaintiffs' inability to demonstrate *individual* reliance by common evidence. The necessity of individual reliance is no longer an aspect of a civil RICO claim predicated on fraud. While we doubt that the slight shift in the law would have completely changed the Fifth Circuit's mind, it may have made it a closer case.

the comprehensive *sui generis* evidence that would arise at trial with respect to each putative class member.  Under those circumstances, Rule 23(b)'s predominance requirement cannot be met.

At bottom, the sort of *quid pro quo* that is present in this case did not exist in *Sandwich Chef*.  The putative class members in *Sandwich Chef* received the insurance they coveted—even if it was a slightly watered-down or less appealing version.  Moreover, the insurance coverage itself was legitimate, and the companies offering it were in the business of providing insurance.  In this case, the victims of Hutchens's fraud were completely deprived of any benefit from their transaction because Hutchens allegedly did not intend to or have the ability to fund any of the loans.  This fact, if proved at trial, will resolve a central, predominating issue that is common to all class members.  Not so in *Sandwich Chef* where common proof simply would not suffice to dispose of any principal issue in that case.

Before moving on, a few observations about the limited effect of this inference on the litigation of the class claims.  As we have explained, the sole result of this inference is that the class members are exempted from demonstrating causation on a class-member-by-class-member basis.  The inference thus manifests primarily as an evidentiary matter: class members will not be required to testify as to their reliance on the lenders' misrepresentations and omissions.  Instead, the putative class members are permitted to use the

common fact that they all forfeited advanced fees as evidence that the class's damages were caused "by reason of" defendants' alleged RICO violations.

But this inference does not shift the burden of proof at trial on the element of RICO causation (or any other elements of the claim)—plaintiffs will still have to *prove* RICO causation by a preponderance of the evidence to win on the merits. *See, e.g.*, *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1362 n.3 (11th Cir. 2002) (distinguishing between presumed reliance and an inference of reliance), *abrogated on other grounds by Bridge*, 553 U.S. 639. Similarly, the trier of fact is not required to accept the inference; it is merely permitted to utilize it as common evidence to establish the class's *prima facie* claims under RICO. Given the significance that RICO's causation element will play at trial, combined with lenders' common misrepresentations and omissions regarding Hutchens's ability or intent to fund the promised loans (which are not challenged here), it is clear that the class's claims will "prevail or fail in unison." *Amgen Inc.*, 133 S. Ct. at 1191. That is enough to satisfy the predominance prong of Rule 23.[11]

---

[11] Apart from the issues of RICO causation, it bears mentioning that another central, generalized element is at the crux of plaintiffs' theory of liability: whether Hutchens and his alleged coconspirators actually misrepresented their ability or intent to satisfy the loan commitments. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (finding that common issues involving the *defendants*' conduct rather than the plaintiffs actions can satisfy the predominance prong of Rule 23). The parties do not focus on this issue as it relates to predominance, but we think it deserves attention. In effect, a predominating question at trial will concern the legitimacy of Hutchens's operation, which can be shown with evidence common to the entire class.

(continued...)

### 4. *Presumption of Reliance*

The foregoing analysis confirms that plaintiffs have satisfied the predominance prong of Rule 23(b)(3). The district court, however, rather than crediting an inference of causation, instead borrowed the presumption of reliance from securities law to give plaintiffs an extra—and ultimately unneeded—boost in their efforts to establish reliance. As we explain, the presumption of reliance does not apply to RICO fraud.[12]

The fraud-on-the-market theory arises from the Supreme Court's interpretation of federal securities law. In securities cases, plaintiffs can take advantage of a legal presumption that the defendant's misrepresentations affected their investment decision in situations where proving causation is unfeasible. *See*

---

[11](...continued)
Presumably, plaintiffs intend to prove Hutchens's low batting average in funding loans, his lack of capitalization, and other features that reflect the illicitness of the scheme. By contrast, Hutchens and his associates will try to discredit this theory, pointing to any available evidence that would probatively communicate Hutchens's authenticity as a lender. On both sides, this dispute is resolvable by common evidence. And the answer to this predominant question may, in many ways, definitively end the litigation. The existence of such a predominating question places a thumb on the scale in favor of class certification. All told, we are satisfied that common questions will predominate over any issue requiring individualized attention.

[12] The legal distinction between a presumption and an inference helps clarify our divergence with the reasoning behind the district court's class certification decision. A presumption is a legal conclusion that will alter the plaintiffs' burden of proof on the merits of their RICO allegations at trial. By contrast, an inference is simply a commonsense deduction based on the facts presented that plaintiffs can use to satisfy Rule 23(b).

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008). For proceedings under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, "[r]equiring a plaintiff to show a speculative state of facts . . . places an unrealistic evidentiary burden on the 10(b) plaintiff." *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000).

This understanding is based on two seminal Supreme Court cases, *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), which are the cornerstones of this presumption of reliance. In *Basic Inc.*, the Supreme Court declined to require the 10(b) plaintiff to provide direct proof of reliance on defendant's misrepresentation, recognizing that doing so "effectively would . . . prevent[] [plaintiffs] from proceeding with a class action" in typical securities fraud cases. *Basic Inc.*, 485 U.S. at 242. And in *Affiliated Ute*, the Court endorsed a similar presumption of reliance when the theory of securities fraud centers on defendant's failure to disclose material information. *Affiliated Ute*, 406 U.S. at 153–54.

The rules from each of these cases largely rest on the unique nature of publicly traded securities markets. This is because the private causes of action under the antifraud provisions of the federal securities laws rely on the condition of the public market at the time of the alleged fraudulent transaction as much as the subjective decisions by individual investors. *See T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irr. Fuel Auth.*, 717 F.2d 1330, 1332 (10th Cir. 1983).

Indeed, the fraud-on-the-market theory allows plaintiffs to benefit from a relaxed pleading standard that grants them a rebuttable presumption of reliance on the value of an allegedly fraudulent security price. *See Basic Inc.*, 485 U.S. at 229–30. For class certification, this legal presumption of classwide reliance is particularly accommodating because it helps avoid questions of individualized reliance and their attendant difficulties under the predominance prong of Rule 23(b)(3). The *sui generis* nature of securities fraud supports the reasoning behind entitling plaintiffs to a presumption of reliance because only where an arguably efficient market provides the backdrop for fraud allegations does the fraud-on-the-market theory hold any water. *See Amgen Inc.*, 133 S. Ct. at 1192. This is so because an efficient market incorporates all publicly available information into a security's price. *Id.* Thus, a particular public, material misrepresentation will artificially inflate the security's price, and individual investors, conscious of the nature of the efficient market, will rely on the price of the security in their decision to invest. *Id.* By relying on the efficiency of the market, an investor has essentially relied on the misrepresentation or omission (even if he never actually heard it). *Id.*

Similarly, as we referenced above, the *Affiliated Ute* presumption posits that when a theory of securities fraud is based on a fraudulent failure to disclose material facts, courts do not require the plaintiff to counterfactually demonstrate that it would have relied on the omitted material information; instead, the court

permits the factfinder to presume that they would have done so.  *See Affiliated Ute*, 406 U.S. at 153–54.  This presumption typically does not apply to affirmative misrepresentations made by the defendant.  *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000).

In sum, the presumption is uniquely applicable in the securities context and it has not gained traction in other fields of law.  *See generally* 2 McLaughlin on Class Actions § 8:11 (10th ed. 2013).  And this presumption is unsuited for RICO fraud cases because they involve a more self-contained universe of plaintiffs and conduct by defendants that does not necessitate a legal presumption.  Given that, we decline to apply a species of the presumption to RICO allegations and cannot endorse the district court's decision holding otherwise.[13]

---

[13]  Although the district court ultimately did not need to employ the *Affiliated Ute* presumption, its predominance analysis was sufficiently rigorous to support the alternative conclusion that we reach today:

> Plaintiffs have evidence and expect to prove that these entities were essentially shell corporations that, like Hutchens himself, had no ability to fund the large loans, let alone the collection of loans to which they committed.  The point of the case is that all of this was a giant ruse to scam applicants possibly desperate for loan funds out of the advance fees that were demanded of them.  Those questions are common to all members of the class.

> If these facts are established, then I am inclined towards the view that proof of actual reliance on an individual basis is not necessary.  *Cf. Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–55 (1972).  It

(continued...)

### 5. *Superiority*

In addition to commonality and predominance, Meisels contends the district court erred in finding that a class action was superior to any other method of adjudication. He claims that the existence of numerous individual actions against the lenders shows that a class action is unnecessary.

Although it is unclear as to the number of individual actions that have been filed around the country concerning this controversy, the mere existence of individual actions brought by putative class members does not necessarily defeat a claim for superiority. *Cf. Vassalle v. Midland Funding LLC*, 708 F.3d 747, 758 (6th Cir. 2013). It is enough that class treatment is superior because it will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

Superiority has been demonstrated here.

---

[13](...continued)
> is difficult to conceive that any individual or entity contemplating a substantial payment of advance fees in support of a loan application would not consider those facts to be important in the making of their decision.

*CGC Holding Co.*, 2013 WL 798242 at *17. If we omit the reference to *Affiliated Ute*, the district court essentially established the "inference" of reliance that we find supportive of the predominance prong. Simply put, going further to draw a presumption of reliance was unnecessary.

## B. *Extraterritoriality of RICO*

Entirely separate from the issue of class certification, Meisels raises an additional claim that challenges whether the district court had subject matter jurisdiction over the claims in this case. He contends that the extent to which RICO applies to conduct outside the United States—or "extraterritorially"—influences the power of the federal courts to hear this matter. By framing this issue as one of jurisdiction, Meisels in effect broadens the limited scope of Rule 23(f) review and asks us to consider prematurely the merits of plaintiffs' RICO claims.

But this argument contravenes the Supreme Court's explicit guidance in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). In *Morrison*, the Court found that the extent to which a statute applies extraterritorially proceeds exclusively as a merits issue, not a question of jurisdiction: "[T]o ask what conduct [a statute] reaches is to ask what conduct [a statute] prohibits, *which is a merits question.*" *Id.* at 2877 (emphasis added). And so, while we can dismiss a case for want of subject matter jurisdiction at any time during the pendency of an action, *Mires v. United States*, 466 F.3d 1208, 1211 (10th Cir. 2006), a Rule 23 interlocutory appeal permits us to consider the merits of the class's claims only to the extent that they overlap with the Rule 23 factors. Thus, an independent review of the merits, untethered to Rule 23, is outside the scope of that review. *Shook I,* 386 F.3d at 971.

Courts addressing the issue since the Supreme Court's decision in *Morrison* have evenly determined that the extraterritoriality of RICO is a question of whether the plaintiffs have stated a claim, not whether the court properly has subject matter jurisdiction.  *See, e.g.*, *United States v. Chao Fan Xu*, 706 F.3d 965, 977 (9th Cir. 2013), *as amended on denial of reh'g* (Mar. 14, 2013); *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 31 (2d Cir. 2010).  That is the identifiable lesson from *Morrison*, and Meisels offers no compelling reason why a straight-forward application of it does not apply here.

Despite *Morrison*'s clear guidance, the parties treat the issue of RICO's extraterritoriality as a dispositive jurisdictional issue, even at the class certification stage of the proceedings.  This is in error, but we pause briefly to address the parties' contentions.  The district court found, and the parties do not dispute, that RICO does not apply extraterritorially.  *See CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193, 1210 (D. Colo. 2011).  But this case poses a slightly different issue; namely, whether the complaint alleges a domestic application of RICO despite its extraterritorial tenor given the Canadian persons and entities.  To understand whether an extraterritorial obstacle exists, the Supreme Court tells us to consider Congress's "focus" in enacting the examined legislation.  *Morrison*, 130 S. Ct. at 2884.  In other words, did Congress intend a statute to encompass conduct outside the United States so as to overcome the

general "presumption against extraterritoriality," or was the focus primarily on domestic conduct? *Id.*

Courts have gone in two directions in identifying the "focus" of RICO. On one side, a collection of courts have found that the focus of RICO is its nerve center, the nefarious enterprise. *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 938–40 (N.D. Cal. 2012); *Cedeno v. Intech Group, Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010) *aff'd sub nom. Cedeno v. Castillo*, 457 F. App'x 35 (2d Cir. 2012); *Farm Credit Leasing Servs. Corp. v. Krones, Inc. (In re Le-Nature's, Inc.)*, No. 9-MC-162, 2011 WL 2112533, at *3 n.7 (W.D. Pa. May 26, 2011); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 914 (C.D. Cal. 2011); *European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011). The appeal of focusing on the nerve center of the enterprise is its administrative ease and consistency. *See Mitsui O.S.K. Lines*, 871 F. Supp. 2d at 940–41. Moreover, attention on the nerve center comports with the purpose of RICO, which punishes racketeering activity *in connection with an enterprise*, not simply the predicate acts, which are separate offenses. *European Cmty.*, 2011 WL 843957, at *5.

On the other side, a collection of courts have found that RICO's focus is the pattern of racketeering activity. *United States v. Chao Fan Xu*, 706 F.3d 965, 975–76 (9th Cir. 2013); *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 243–46 (S.D.N.Y. 2012); *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 29

(D.D.C. 2011).  The genesis of this position is pre-*Morrison* Supreme Court jurisprudence that insisted that "the heart of any RICO complaint is the allegation of a pattern of racketeering." *Agency Holding v. Malley-Duff Assoc.*, 483 U.S. 143, 154 (1987) (emphasis omitted).  In addition, "[t]his approach . . . would afford a remedy to a U.S. plaintiff who claims injury caused by domestic acts of racketeering activity without regard to the nationality or foreign character of the defendants or the enterprise whose affairs the defendants wrongfully conducted." *Donziger*, 871 F. Supp. 2d at 244.  The landscape surrounding RICO's enactment also suggests that it was intended to reach at least some enterprises operating out of foreign countries.

The district court's decision lands within this latter group of courts, applying the so-called predicate acts approach.  *See CGC Holding Co.*, 824 F. Supp. 2d at 1209. ("[T]he *conduct* of the enterprise within the United States was the key to its success." (emphasis added)).  Indeed, the opinion below was cited as persuasive authority in several subsequent cases, including *United States v. Chao Fan Xu*, 706 F.3d 965, 979 (9th Cir. 2013), and *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 243–45 (S.D.N.Y. 2012).

Looking to the plain language of the legislation does not provide a conspicuous answer to which approach Congress favored when it enacted RICO. And neither approach is unimpeachable.  For example, courts applying the enterprise approach have recognized its limitations, noting "hard cases" may

-43-

present particularized facts surrounding the enterprise's home base that may not be as predictable. *European Cmty.*, 2011 WL 843957, at *6. And by a similar token, the predicate acts approach is subject to criticism because it does not lend itself to an obvious limiting principle. Under its logic, a RICO claim involving domestic predicate acts—which is to say, *every* RICO claim—would be potentially viable even when the enterprise, victims, and schemes are almost completely foreign.

In the end, notwithstanding the parties' attention to this issue, we need not resolve finally which approach is preferred in the circuit. On this interlocutory appeal, we do not decide the merits of plaintiffs' claims, including the extent to which those claims involve an extraterritorial application of RICO. Since the question of the extraterritoriality of a statute is a merits question, resolving it must await a final disposition from the court below.

### C. Additional Considerations

Finally, we must briefly address several ancillary issues that the parties raised in the three separate appeals before us.

### 1. Personal Jurisdiction Over Transferees

First, Hutchens argues the district court erred in finding the court could exercise personal jurisdiction over the transferees.

A district court's decision denying a motion to dismiss for lack of personal jurisdiction "is not an immediately appealable collateral order." *Van*

*Cauwenberghe v. Biard*, 486 U.S. 517, 527 (1988). To be sure, we have the authority to exercise pendent appellate jurisdiction over decisions related to personal jurisdiction when we have an otherwise valid interlocutory appeal before us. But our use of pendent appellate jurisdiction "is generally disfavored." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1205 (10th Cir. 2008). Indeed, "[i]t is appropriate to exercise pendent appellate jurisdiction only where resolution of the appealable issue necessarily resolves the nonappealable issue, or where review of the nonappealable issue is necessary to ensure meaningful review of the appealable one." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1293 (10th Cir. 2008) (internal quotation marks omitted). As the Supreme Court has cautioned, the narrow category of issues that deserve pendent review "includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995).

Despite the parties' stipulation regarding our power to exercise jurisdiction over the district court's decision to take personal jurisdiction over the transferees, we decline to do so. Quite clearly, the question is beyond the scope of a traditional Rule 23(f) review, and the parties have completely failed to explain why pendent appellate jurisdiction is appropriate under the circumstances. At bottom, the personal jurisdiction issue and the class certification decision are not

so "inextricably intertwined . . . that review of the former decision [is] necessary to ensure meaningful review of the latter." *Swint*, 514 U.S. at 51. And Rule 23 does not permit a party to shoehorn every decision that went against it into its petition for interlocutory review.

Under the circumstances, we refuse to permit an end-run around the general rule disfavoring interlocutory appeals on this issue.

### 2. Standing and Proximate Causation

By the same token, we reject Hutchens's suggestion that plaintiffs lack standing to bring their RICO claims due to a failure to allege proximate causation.[14] Rightly understood, this is a surreptitious effort to challenge the merits of the class claims, which are not at issue at the class certification stage. Yes, sufficiently alleging proximate cause is necessary to establish standing under RICO, *Bixler*, 596 F.3d at 756, but accepting plaintiffs' allegations as true, we are satisfied that plaintiffs have properly pleaded proximate cause to earn standing to vindicate the alleged wrongs. *Gillmor v. Thomas*, 490 F.3d 791, 797 & n.4 (10th Cir. 2007). By alleging that the putative class members were the "direct targets" of defendants' fraudulent scheme (based on the alleged RICO predicate acts), plaintiffs have adequately established the requisite causal connection between defendants' act and each class member's financial loss. *See Brokerage Concepts,*

---

[14] Meisels makes a version of this argument in his appeal, and we reject it for the same reason.

*Inc. v. U.S. Healthcare*, Inc., 140 F.3d 494, 521 (10th Cir. 1998); *see also*
*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004); *Baisch v.*
*Gallina*, 346 F.3d 366, 373 (2d Cir. 2003); *Mid Atl. Telecom, Inc. v. Long*
*Distance Servs., Inc.*, 18 F.3d 260, 263–64 (4th Cir. 1994).

As the natural, foreseeable, and, most importantly, intended victims of the
alleged fraud, plaintiffs have sufficiently pleaded proximate causation to survive
a threshold standing inquiry. In essence, Hutchens alleges that defendants will
eventually win because the facts demonstrate the causal weaknesses in the class's
RICO claims.[15] That argument may be sound, but it invites an ultimate judgment
about the defendants' liability, not plaintiffs' entitlement to bring legal action.

In sum, saying nothing of the *strength* of their RICO cause of action,
plaintiffs have a viable theory of causation that is adequate to confer *standing*
under RICO at this stage in the litigation.[16]

---

[15] Many of the defendants, for example, point out plaintiffs' concession
that there may have been legitimate reasons for lenders to deny each class
member's loan application. According to defendants, this destroys proximate
cause. On the merits, this might be true, and the parties can certainly litigate this
issue at trial. As a threshold matter, however, these arguments of proximate
causation do not divest plaintiffs of standing to bring their well-pleaded RICO
claims.

[16] We recognize that questions of proximate causation often converge at a
point existing between standing and the merits. *Holmes*, 503 U.S. at 268–69. But
however large the overlapping space in this metaphorical Venn diagram, the
questions raised by defendants are firmly in the merits circle.

### 3.  Standing with Respect to Broad

Finally, we do accept the plaintiffs' concession that they lack standing to pursue their claims against Broad.  Regardless of the merits of this about-face, plaintiffs have relinquished their intent to establish the justiciability of those claims and can no longer fairly and adequately protect the interests of any putative class members that could assert valid causes of action vis-a-vis Broad. Accordingly, we reverse the district court's decision to the extent it certified a class against only Broad and Cassel, Gaché, and Romano and remand those claims to the district court with instructions to dismiss without prejudice.  *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

## III.  Conclusion

Based on the analysis above, we REVERSE and REMAND the district court's class certification decision as it pertains to Broad and Cassel, Gaché, and Romano.  In all other respects, we AFFIRM the district court's decision to certify a class.  The remaining issues raised by defendants are not properly before us on this Rule 23(f) interlocutory review, and we decline to address them at this juncture.